UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LISA BREMER,**<br>6702 McCrea Place<br>Falls Church, VA 22042<br><br>PLAINTIFF<br><br>v.<br><br>**DONALD L. EVANS,**<br>Secretary of the United States<br>Department of Commerce,<br>1401 Constitution Avenue, N.W.<br>Washington, DC 20230<br><br>DEFENDANT | Case No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

**(Disability Discrimination, Retaliation)**

1.  Plaintiff Lisa Bremer brings this action against Defendant Donald L. Evans, Secretary of the United States Department of Commerce, to recover, compensatory damages, back pay, front pay, and reasonable attorney's fees and costs for discrimination and retaliation under the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. §791, et seq.

**PARTIES, JURISDICTION, AND VENUE**

2.  Plaintiff Lisa Bremer is a resident of 6702 McCrea Place, Falls Church, Virginia 22042.

3.  Defendant Donald L. Evans is the Secretary of the United States Department of Commerce (Commerce), an agency of the federal government.

4.  Commerce employed Ms. Bremer at its Headquarters, located at 1401 Constitution Avenue, N.W., Washington, D.C. 20230, from June 1987, to April 2, 2003, with exception of five months in 1990, when she worked in Philadelphia, PA.

1

5.  The Rehabilitation Act, 29 U.S.C. §794a(a)(1), provides this Court with personal jurisdiction over Commerce because the acts Ms. Bremer alleges as discriminatory and retaliatory occurred at Commerce's Washington, D.C. Headquarters.

6.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331.

7.  Venue is proper in this Court pursuant to 28 U.S.C. §1391.

8.  Ms. Bremer properly exhausted her administrative remedies pursuant to 29 C.F.R. §1614.407(c).

## STATEMENT OF FACTS

9.  In June 1987, Commerce hired Ms. Bremer as an Attorney Advisor, GS-11, in the Office of Chief Counsel, Economic Development Administration (EDA).

10. In 1988, following Ms. Bremer's first annual performance review, Commerce promoted Ms. Bremer to GS-12.

11. In 1990, Commerce promoted Ms. Bremer twice, first to GS-13, after her performance review, and then to GS-14, after a special waiver.

12. Later in 1990, Ranjit B. Mani, M.D., F.R.C.P., a neurologist, tentatively diagnosed Ms. Bremer with multiple sclerosis, a degenerative neurological disease.

13. By 1991, Ms. Bremer began experiencing difficulty walking, and, therefore, requested that Commerce provide a handicapped parking space for her. Commerce arranged for Laura Welch, M.D., to examine Ms. Bremer to determine if Ms. Bremer needed a handicapped parking space.

14. On July 25, 1991, Dr. Welch examined Ms. Bremer and concluded Ms. Bremer required a handicapped parking space. On August 1, 1991, Commerce assigned a handicapped parking space to Ms. Bremer.

15. In October 1991, Dr. Mani, officially diagnosed Ms. Bremer with multiple sclerosis.

16. On November 14, 1991, Dr. Mani requested Commerce place Ms. Bremer on a flexible work schedule in order to accommodate her multiple sclerosis symptoms. On November 22, 1991, Commerce approved the flexible schedule.

17. On July 13, 1993, Dr. Mani requested that Commerce allow Ms. Bremer to telecommute, i.e., work at home, in order to accommodate her multiple sclerosis symptoms. Commerce approved Dr. Mani's request, and Ms. Bremer began telecommuting two days per week.

18. On September 30, 1996, Perry K. Richardson, M.D., another treating neurologist, requested that Commerce allow Ms. Bremer to use a motorized scooter in the office because of her difficulty walking. Commerce approved Dr. Richardson's request and purchased a motorized scooter for Ms. Bremer's use.

19. In 1996 and 1997, Edward M. Levin, then Commerce's Chief Counsel and Ms. Bremer's direct supervisor, rated Ms. Bremer's annual performance as "outstanding," the highest rating possible at Commerce.

20. On August 5, 1998, Dr. Richardson requested that Commerce permit Ms. Bremer to travel in "first class" when traveling by air because Ms. Bremer requires extra leg room due to spasticity in her legs. Again, Commerce approved Dr. Richardson's request.

21. In 1998, Mr. Levin again rated Ms. Bremer's annual performance as "outstanding."

22. In October 1999, Mr. Levin promoted Ms. Bremer to GS-15 after again rating her annual performance "outstanding."

23. In November 1999, Chester J. Straub, Jr., Acting Assistant Secretary for EDA, requested that Commerce give Ms. Bremer a "Quality Step Increase" (QSI) and a performance award for her continued "outstanding" performance. Commerce approved Mr. Straub's request.

3

Additionally, Commerce made Ms. Bremer the Freedom of Information Act (FOIA)/Privacy Act Officer for EDA.

24.     Ms. Bremer consistently performed at the highest level, "outstanding," notwithstanding her disability of multiple sclerosis and the required accommodations.

25.     On July 25, 2001, Commerce appointed Claudia Nadig as its Chief Counsel. Ms. Nadig then became Ms. Bremer's direct supervisor.

26.     On July 30, 2001, Ms. Bremer fell at work when her knee buckled. During the fall, Ms. Bremer injured her back and shoulder by striking them on her desk and a filing cabinet.

27.     On August 22, 2001, Ms. Nadig demanded Ms. Bremer complete a worker's compensation report concerning her fall, although Commerce did not require the report.

28.     On September 17, 2001, Ms. Nadig claimed she could not find updated medical information or a written plan for accommodations in Ms. Bremer's file. Ms. Nadig requested Ms. Bremer provide her with updated medical information.

29.     Ms. Bremer responded to Ms. Nadig with an email stating:

> I have multiple sclerosis, a progressive [degenerative] disease . . . with no cure. I have had a flexible work schedule since 1991 and a telecommuting schedule since 1994. At those times, I submitted medical documentation and these actions were approved.

30.     On September 25, 2001, Dayle Ginsburg, who had been Commerce's Acting Chief Counsel from January 2001, until July 25, 2001, and Ms. Bremer's immediate supervisor for that period, provided Ms. Nadig with the evaluation she (Ms. Ginsburg) did of Ms. Bremer's performance for the period Ms. Ginsburg supervised Ms. Bremer. Ms. Ginsburg rated Ms. Bremer "outstanding" on all of her performance elements.

31.     On September 28, 2001, Ms. Nadig sent Ms. Bremer a letter stating:

> [Y]ou currently work three days a week in the office and two days a week at home as an accommodation . . . I need to determine whether you continue to need this accommodation or whether there is any additional accommodation you may require. In order to ensure that we can continue to provide reasonable accommodation for your medical condition, I need updated medical information . . . .

32.  The same day, after receiving this letter, Ms. Bremer contacted Commerce's EEO Officer. Ms. Bremer alleged Ms. Nadig was discriminating against her on the basis of disability.

33.  On October 6, 2001, Dr. Richardson sent a letter to Lawrence P. Saladino, M.D., Commerce's Medical Officer. Dr. Richardson's letter explained that it is "medically necessary" that Commerce provide Ms. Bremer with reasonable accommodations, including a flexible work schedule, telecommuting, a handicapped parking space, and a motorized scooter. Additionally, Dr. Richardson stated:

> I have reviewed [Ms. Bremer's] job description and find no reason . . . Ms. Bremer cannot fulfill any of her job requirements . . . . She has physical limitations caused by her multiple sclerosis. These limitations can be overcome with assistance and accommodation.
>
> The accommodations which Ms. Bremer currently has . . . are minimally sufficient.

34.  October 10, 2001, Dr. Mani also wrote a letter to Dr. Saladino explaining the medical necessity of Commerce's four reasonable accommodations for Ms. Bremer. Dr. Mani stated:

> Parking space – [Ms. Bremer's] considerable impairment of mobility . . . and her proneness to fatigue makes easy and reliable access to her place of [work] vital to her general well-being and her ability to do her job.
>
> Motorized scooter – [Ms. Bremer's] lower extremity weakness and stiffness, unsteady gait and easy fatiguability especially when walking, lead me to recommend that the use of a motorized scooter is essential.
>
> Flexible work schedule – [Ms. Bremer's] unpredictable proneness to marked fatigue (a cardinal feature of multiple sclerosis) and to equally unpredictable periods of worsened neurological function necessitate a flexible work schedule.

> Tele-commuting . . . – such an accommodation is again necessitated by her unpredictable tendencies to severe fatigue and worsened neurological function. Also, she is at an increased risk of falling because of her lower extremity weakness and stiffness, unsteady gait and impaired position sense . . . .

Dr. Mani also stated, "I must emphasize that environmental stressors have an enormous impact and can greatly exacerbate any of Ms. Bremer's numerous symptoms."

35.   On November 5, 2001, after reviewing Drs. Richardson's and Mani's letters, Dr. Saladino, Commerce's own Medical Officer, sent an email to Ms. Nadig stating the following:

> Both letters provide very strong support for continuation of [Ms. Bremer's] reasonable accommodations, specifically including 1) flexible work schedule, 2) telecommuting, 3) use of a motorized scooter at work, and 4) continuation of handicapped parking privileges. In addition, both letters indicate potential for serious injury and/or harm from lack of these accommodations. Apparently, Ms. Bremer's medical condition has worsened recently. One of the letters seems to suggest that this may be attributable to job stress and emphasizes the need for her [to] receive support at work along with continuing her present accommodations."

36.   After receiving this letter, Ms. Nadig requested a meeting with Dr. Saladino. On November 9, 2003, Ms. Nadig and Dr. Saladino met, and Dr. Saladino explained to Ms. Nadig the medical necessity of each of Ms. Bremer's accommodations. Ms. Nadig then asked Dr. Saladino to show her Ms. Bremer's medical documentation, but Dr. Saladino refused, telling Ms. Nadig he did not have consent to show her the documents.

37.   On November 13, 2001, Bernadette M. Worthy, EEO Officer, sent a memorandum in preparation for Ms. Bremer's performance review to Ms. Nadig concerning Ms. Bremer's "outstanding" performance as an EEO Counselor, a collateral duty in Ms. Bremer's performance plan.

38.   Also on November 13, 2001, Ms. Nadig alleged that Ms. Bremer took unauthorized leave on November 9, 2001. Ms. Bremer explained she requested the leave twice, first by email on September 10, 2001, and then by placing a leave slip in Ms. Nadig's box on November 5, 2001.

6

39.	On November 14, 2001, Ms. Nadig counseled Ms. Bremer, in a meeting and by memorandum, for allegedly discussing the regional directors' performance evaluations with EDA employees. Robert Montague, Employee Relations Specialist, also attended the session at Ms. Nadig's request. Ms. Bremer denied Ms. Nadig's allegation, and Ms. Nadig never produced any substantiating evidence for this unfounded criticism.

40.	On November 23, 2001, Ms. Bremer requested advanced sick leave, and, alternatively, leave under the Family and Medical Leave Act (FMLA). Ms. Bremer attached a note from her internist, Lillian B. Hunt, M.D., stating that Ms. Bremer was unable to work.

41.	Dr. Hunt sent Dr. Saladino a letter on November 23, 2001, explaining that Ms. Bremer's stressful work environment was exacerbating her multiple sclerosis.

42.	On November 26, 2001, Ms. Nadig stated she could not approve Ms. Bremer's request for FMLA leave because Ms. Bremer did not specify the dates she expected to be on leave, nor did she attach the necessary medical information.

43.	The same day, Dr. Mani sent Dr. Saladino a letter explaining that due to work related stress, Ms. Bremer's symptoms have worsened over the past two months.

44.	 On December 4, 2001, due to the stress caused by Ms. Nadig's discriminatory treatment, Ms. Bremer renewed therapy with Elizabeth Hillenbrand, Ph.D., a psychologist Ms. Bremer had seen when she was first diagnosed with multiple sclerosis.

45.	On December 7, 2001, an EEO counselor contacted Ms. Bremer to begin processing Ms. Bremer's complaint. Ms. Bremer explained that Ms. Nadig was still harassing her because of her disability. The EEO counselor set up interviews with both Ms. Bremer and Ms. Nadig.

46.	On December 12, 2001, Dr. Saladino informed Ms. Nadig that Ms. Bremer's medical documentation showed Ms. Bremer is unable to work.

47.     On December 18, 2001, Ms. Nadig sent Ms Bremer her annual performance evaluation. Ms. Nadig rated Ms. Bremer's performance as "fully successful," two full levels lower than Mr. Levin rated her in 2000, and the lowest appraisal Ms. Bremer ever received at Commerce.  Ms. Nadig's evaluation did not incorporate Ms. Ginsburg's evaluation, which concluded that Ms. Bremer's performance was "outstanding."

48.     On December 19, 2001, Ms. Nadig prohibited Ms. Bremer's co-workers, Irshad Abda-Haqq and Rachael Sullivan, from accepting leave-related telephone messages from Ms. Bremer. Ms. Nadig ordered them to instead transfer Ms. Bremer's calls directly to Ms. Nadig.

49.     On December 26, 2001, the EEO counselor interviewed Ms. Nadig concerning Ms. Bremer's complaint.

50.     On January 14, 2002, Ms. Bremer returned to work.  Upon her return, Ms. Bremer gave Ms. Nadig a note from Dr. Hunt, in which Dr. Hunt recommended that Ms. Bremer only work four days a week, two in the office and two at home, until a follow-up appointment in February.

51.     On January 24, 2002, Ms. Bremer filed a formal complaint of disability discrimination and retaliation.

52.     On January 25, 2002, Ms. Nadig claimed Ms. Bremer's performance was unacceptable because of her 1) "delay in distributing search requests . . . and failure to submit a search request," and 2) "deficient" activity reports.

53.     On February 3, 2002, Ms. Bremer sent Ms. Nadig a memorandum stating that per Dr. Mani's order, she was unable to work.  Ms. Bremer attached Dr. Mani's note and a request for sick leave through February 22, 2002, to the memorandum.

54.     On February 5, 2002, Ms. Nadig sent Ms. Bremer a letter concerning Ms. Bremer's employment.  Ms. Nadig began by asking Ms. Bremer to provide additional information from

her physician concerning when she could return to work. Ms. Nadig then stated she was changing Ms. Bremer's performance plan to remove her FOIA/Privacy Act Officer duties in exchange for the administration of loans involving the Liquidations Division. Ms. Nadig claimed she would assign Ms. Bremer's FOIA/Privacy Act Officer duties to a nonattorney, but Ms. Nadig gave the assignment to Jennifer Bryan, a GS-15 level attorney. Ms. Nadig made these assignments despite that Ms. Bremer had less experience administering loans than Ms. Bryan, and Ms. Bryan had less FOIA/Privacy Act experience. Ms. Nadig also placed Ms. Bremer on "leave restriction," requiring Ms. Bremer to submit medical documentation for any absence, instead of just for absences longer than three days, as agency rules require. Finally, Ms. Nadig took away Ms. Bremer's telecommuting accommodation. Ms. Nadig stated she would no longer permit Ms. Bremer to telecommute for "obvious reasons."

55.     On February 25, 2002, Ms. Bremer sent Ms. Nadig a memorandum, with a note from Dr. Mani, requesting additional leave until March 22, 2002.

56.     On March 7, 2002, Ms. Nadig approved Ms. Bremer's request for sick leave, but only for 126 hours. Ms. Bremer had requested 160 hours. Ms. Nadig also asked Ms. Bremer to have her physician provide an estimated return date or an explanation why he or she cannot give an estimate.

57.     On March 20, 2002, Ms. Bremer submitted a leave transfer application to Commerce. Dr. Mani filled out supporting forms, stating Ms. Bremer "will not be able to work at all as a result of her condition" until August 1, 2002.

58.     On April 15, 2002, after a delay of almost one month, Commerce approved Ms. Bremer's leave transfer application and credited 80 hours of sick leave toward her leave balance. Melanie

Hazlett, from the Office of Human Resource Management, asserted that the delay in the approval of Ms. Bremer's application was due to Ms. Nadig's refusal to sign the application.

59. On May 13, 2002, Ms. Bremer called Ms. Hazlett after receiving a considerably smaller than usual pay check for the period April 21, 2002, to May 4, 2002. Ms. Bremer's payroll statement showed that she was in Leave Without Pay (LWOP) status for 61 hours. Ms. Hazlett told Ms. Bremer that she (Ms. Hazlett) had notified Ms. Bremer's timekeeper that Ms. Bremer had sufficient leave donations to be in full pay status. Ms. Hazlett corrected Ms. Bremer's pay, but she was unable to restore the leave that Ms. Bremer did not accrue while she was placed in LWOP status by Ms. Nadig.

60. On July 22, 2002, Ms. Bremer sent Ms. Nadig a letter from Dr. Richardson stating Ms. Bremer "had a medical interruption in her progress, requiring additional treatment." Dr. Richardson prohibited Ms. Bremer from retuning to work until October 1, 2002.

61. On August 1, 2002, Ms. Nadig sent Ms. Bremer a letter by federal express stating Ms. Bremer's "absence has had an adverse impact in [the] ability of the Office of the Chief Counsel to perform our mission . . . . [t]therefore, we need to know . . . how likely it is that you will be able to return to work on October 1, 2002 . . . ."

62. On September 25, 2002, Ms. Nadig sent Ms. Bremer another letter stating Ms. Bremer's "continued absence is having an adverse impact on the ability of this Office to accomplish its mission." Ms. Nadig also charged Ms. Bremer with unauthorized leave (AWOL), claiming she did not receive Ms. Bremer's request for leave for September 8 to 21, 2002.

63. On September 30, 2002, Ms. Bremer faxed a letter written by Dr. Hunt to several individuals, including Secretary Evans and Ms. Nadig. In the letter, Dr. Hunt stated that Ms. Bremer fell on September 27, 2002, preventing her from returning to work until at least January

2003. Dr. Hunt also described how Ms. Nadig's ill treatment of Ms. Bremer had exacerbated Ms. Bremer's multiple sclerosis, stating she, Dr. Mani, and Dr. Hillenbrand all agree that:

> the ongoing harassment that [Ms. Nadig] has subjected Ms. Bremer to while she has been on medical leave and under the active care of [several physicians] has severely interfered with Ms. Bremer's rehabilitation and recuperation."

Further, Dr. Hunt stated:

> It is especially unconscionable that [Ms. Nadig] would abolish Ms. Bremer's ability to work from home.  Dr. Ranjit Mani, in a letter dated October 10, 2001, and Dr. Perry Richardson, in a letter dated October 6, 2001, both fully explained the absolute necessity and medical justification for such an accommodation. This accommodation has been in place for over ten years and is even more medically necessary now that when it was approved in 1991 due to the progressive and degenerative nature of Multiple Sclerosis.  Without this accommodation, Ms. Bremer will not be able to resume a full-time schedule which she has been able to perform successfully for more than ten years . . . .

64.     From October 2 to 6, 2002, Ms. Bremer was hospitalized due to a fall which caused a significant deterioration in her condition and stress related exacerbation of her multiple sclerosis.

65.     Also on October 2, 2002, Ms. Nadig sent Ms. Bremer a letter stating she had "no option but to charge" Ms. Bremer AWOL, and would continue to classify her as AWOL.

66.     On December 30, 2002, Ms. Bremer informed Ms. Nadig she received 38 hours of donated leave and questioned why Ms. Nadig placed her in AWOL status.

67.     On December 31, 2002, Dr. Richardson wrote a letter stating Ms. Bremer has "no chance of recovery, and . . . given the recent restrictions imposed on her work environments, she is no longer able to work in her present job."

68.     On January 2, 2003, Dr. Hunt wrote a letter explaining Ms. Bremer was unable to work because she was taking a high dosage IV steroid treatment following another fall.

69.     On January 13, 2003, Dr. Mani concluded Ms. Bremer should apply for disability retirement:

11

> [Ms. Bremer] remains very keen to continue working as an attorney. However, given how stressful her working environment currently is, the highly deleterious effect that stress is having on her multiple sclerosis, and the withdrawal of [her telecommuting schedule,] . . . an important accommodation at work, I see no possibility whatsoever of her being able to return to her present job.

70. On January 14, 2003, Dr. Hunt agreed, writing:

> I believe that the deterioration in her condition is clearly attributed to the stressful and hostile work environment that [Ms. Bremer] has had to endure, therefore, it is my medical opinion that she is unable to return to work without risk of further or permanent deterioration in her condition.

71. Also on January 14, 2003, Ms. Bremer informed Ms. Nadig she had received another 40 hours of donated leave. Also, Ms. Bremer again questioned why Ms. Nadig had her in AWOL status. Ms. Nadig never responded, but she continued to classify Ms. Bremer as AWOL.

72. On February 5, 2003, Ms. Bremer faxed a notice to Ms. Hazlett that she (Ms. Bremer) was withdrawing from the leave transfer program because of Ms. Nadig's refusal to allow Ms. Bremer to use donated leave. Ms. Bremer returned 48 hours of donated leave to the donors.

73. On February 4, 2003, Ms. Bremer was forced to submit an application for disability retirement to Commerce because of the intolerable hostile work environment Ms. Nadig created, which exacerbated Ms. Bremer's multiple sclerosis. Ms. Bremer had no intention of retiring prior to the beginning of Ms. Nadig's harassment.

74. On March 20, 2003, Ms. Bremer submitted an application for Worker's Compensation to Commerce. In her application, which is still pending, Ms. Bremer asserted work related stress exacerbated her multiple sclerosis. Ms. Bremer's application included: 1) a June 25, 2002 letter written by Dr. Hillenbrand stating "[t]he deterioration in [Ms. Bremer's] physical condition appears to myself and her physicians to arise solely from the severe stress of working in [an intolerable] situation." 2) a January 13, 2003 letter written by Dr. Mani stating:

12

> [Ms. Bremer's] neurological deterioration over that past 10 months has occurred at the same time Ms. Bremer has been experiencing an unrelenting period of stress at work. . . . The actions of her current supervisor have even extended to withdrawing one of her special accommodations at work (her telecommuting or work-at-home schedule), and denying her the use of sick leave. . . . I have no doubt . . . that her . . . recent deterioration, and her lessened responsiveness to treatment are . . . attributable to the stress . . . ; my own observations indicate a repeated, close relationship between periods of intense stress at work and a worsening in her symptoms.

and 3) a January 14, 2003 letter from Dr. Hunt stating **"MS is a disease that is greatly affected by stress.  The correlation between the stressful incidents [at work] and a worsening in Ms. Bremer's medical condition in clear."**

75. On April 2, 2003, the Office of Personnel Management (OPM) approved Ms. Bremer's disability retirement application.

76. On April 4, 2003, Reginald D. Wills, M.D., who replaced Dr. Saladino as Commerce's Medical Officer, wrote a letter to Ms. Bremer stating that he reviewed Ms. Bremer's medical reports, which were submitted to Commerce on February 5, 2003, and supported her disability retirement application.

76. Ms. Bremer retired on April 5, 2003.

77. Despite OPM's approval and Dr. Wills' support for Ms. Bremer's disability retirement application, Ms. Nadig continued to classify Ms. Bremer as AWOL until April 5, 2003, the last day of the pay period, leaving Ms. Bremer listed as AWOL for nearly six months, since September 2002.

**FIRST CAUSE OF ACTION**
**(Failure to Accommodate)**

78. Ms. Bremer adopts and incorporates by reference paragraphs 1 through 77 above.

79. Ms. Bremer's multiple sclerosis substantially limits one or more of her major life activities, making her disabled.

13

80.   Ms. Bremer is qualified to perform the essential functions of her job with reasonable accommodation.

81.   The Rehabilitation Act, 29 U.S.C. §791(b), requires Commerce, a federal employer, to make reasonable accommodations for Ms. Bremer unless Commerce can demonstrate that the accommodation imposes an undue hardship.

82.   Prior to 2001, Commerce provided Ms. Bremer the following accommodations: 1) a handicapped parking space, 2) a flexible work schedule, 3) telecommuting, and 4) use of a motorized scooter in the office.

83.   In September 2001, Ms. Nadig requested Ms. Bremer provide updated medical information to support her continuing need for accommodations.

84.   On November 5, 2001, Dr. Saladino, Commerce's own Medical Officer, reviewed Ms. Bremer's updated medical information and informed Ms. Nadig of the necessity of Ms. Bremer's four accommodations.

85.   On November 9, 2003, Ms. Nadig and Dr. Saladino met, and Dr. Saladino explained the medical necessity of each of Ms. Bremer's accommodations.  Ms. Nadig asked Dr. Saladino to show her Ms. Bremer's medical documentation, but Dr. Saladino refused, because he did not have consent to show anyone the documents.

86.   On February 5, 2002, Ms. Nadig took away Ms. Bremer's telecommuting accommodation, stating she would no longer permit Ms. Bremer to telecommute for "obvious reasons."  Ms. Nadig also removed Ms. Bremer's FOIA/Privacy Act Officer duties and assigned loan administration duties to her instead.

## SECOND CAUSE OF ACTION
(Disability Harassment)

87.   Ms. Bremer adopts and incorporates by reference paragraphs 1 through 86 above.

14

88. The Rehabilitation Act, 29 U.S.C. §794(a), prohibits Commerce from discriminating against Ms. Bremer "solely by reason of her . . . disability."

89. Ms. Bremer's multiple sclerosis is a disability.

90. Ms. Bremer is qualified to perform the essential functions of her job with reasonable accommodations.

91. Ms. Bremer has suffered an adverse employment action, a hostile work environment, because of her disability.

92. Ms. Nadig created this hostile work environment when she harassed Ms. Bremer by various act, including but not limited to the following: 1) on August 22, 2001, by demanding Ms. Bremer file for worker's compensation; 2) on September 28, 2001, by requiring Ms. Bremer to submit additional medical information to maintain her accommodations; 3) on November 13, 2001, by accusing Ms. Bremer of taking unauthorized leave; 4) on November 14, 2001, by reprimanding Ms. Bremer for allegedly discussing the regional directors' performance evaluations with other EDA employees; 5) on November 26, 2002, by denying Ms. Bremer's FMLA request; 6) on December 18, 2001, by reducing Ms. Bremer's performance rating to "fully successful;" 7) on December 19, 2001, by prohibiting Ms. Bremer's co-workers from taking leave related messages from her; 8) on January 25, 2002, by claiming Ms. Bremer's performance was unacceptable; 9) on February 5, 2002, by changing Ms. Bremer's performance plan and duties, placing her on leave restriction, and taking away an accommodation; 10) on March 7, 2002, by denying Ms. Bremer sick leave; 11) in March 2002, by refusing to allow Ms. Bremer to register for leave donation; 12) on August 1, 2002, and September 25, 2002, by sending harassing letters and charging Ms. Bremer AWOL; 13) by refusing to take Ms. Bremer

out of AWOL status; and 14) by continually, since September 2001, sending Ms. Bremer requests for medical documentation.

### THIRD CAUSE OF ACTION
### (Retaliation)

93.     Ms. Bremer adopts and incorporates by reference paragraphs 1 through 92 above.

94.     The Rehabilitation Act, 29 U.S.C. §794(a), provides a cause of action for retaliation pursuant to its incorporation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §12203(a), which prohibits employers from taking reprisal against "any individual because such individual has opposed any act or practice made unlawful by this Act . . . ."

95.     Ms. Bremer opposed practices made unlawful by the Rehabilitation Act when on September 28, 2001, she contacted Commerce's EEO Office to allege disability discrimination.

96.     Ms. Bremer also opposed practices made unlawful by the Rehabilitation Act when on December 7, 2001, an EEO counselor contacted her and she alleged Ms. Nadig was still harassing her on the basis of disability.  The EEO counselor then set up interviews with both Ms. Bremer and Ms. Nadig.

97.     Shortly after, on December 18, 2001, Ms. Nadig retaliated against Ms. Bremer by giving her a negative performance evaluation and harassing Ms. Bremer about her use of leave.

98.     On December 26, 2001, the EEO counselor interviewed Ms. Nadig concerning Ms. Bremer's complaint.

99.     On January 24, 2002, Ms. Bremer again opposed practices made unlawful by the Rehabilitation Act when she filed a formal complaint of disability discrimination and retaliation.

100.    Shortly after, Ms. Nadig began harassing Ms. Bremer by: 1) on January 25, 2002, claiming Ms. Bremer's performance was unacceptable; 2) on February 5, 2002, changing Ms. Bremer's performance plan to increase her duties, placing her on leave restriction, and taking

away an accommodation; 3) continually harassing Ms. Bremer about her use of leave; and 4) charging Ms. Bremer AWOL.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Lisa Bremer requests judgment against Donald L. Evans, Secretary of the United Stated Department of Commerce, as follows:

A.  $300,000.00 in compensatory damages.

B.  Front pay, in the amount of the difference between Ms. Bremer's salary with benefits, including thrift savings and other retirement plans/annuities, and her lesser disability retirement annuity.

C.  Back pay, for the all of the time Ms. Bremer had to take off as leave, LWOP, or when Ms. Nadig charged her AWOL.

D.  Back pay, for Ms. Bremer's failure to receive performance awards or QSIs from the time Ms. Nadig became her supervisor.

E.  Reasonable attorneys' fees and costs.

F.  Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Lisa Bremer demands a jury to determine all issues so triable.

June 16, 2003                                         Respectfully submitted,

_____
Joseph V. Kaplan
D.C. Bar No. 347344
PASSMAN & KAPLAN, P.C.
1090 Vermont Avenue, N.W., Suite 500
Washington, D.C. 20005
TEL:  (202) 789-0100
FAX:  (202) 789-0101
Attorney for the Plaintiff